IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
February 2, 2011 Session

**SUSAN D. MALONE v. JAMES P. MALONE**

**Appeal from the Circuit Court for Hamilton County**
**No. 05-D939      Jacqueline S. Bolton, Judge**

_____

**No. E2010-01455-COA-R3-CV-FILED-JULY 26, 2011**

_____

This is a divorce case. The husband appeals, challenging the trial court's determinations regarding the classification of property and the valuation and distribution of the marital assets. Wife raises additional issues concerning the property classification and attorney fees. As modified, the trial court's judgment is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed as Modified; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

Mitchell A. Byrd, Chattanooga, Tennessee, for the appellant, James P. Malone.

Sandra J. Bott, Chattanooga, Tennessee, for the appellee, Susan D. Malone.

**OPINION**

**I. BACKGROUND**

The parties in this matter, Susan D. Malone ("Wife") and James P. Malone ("Husband"), were married on May 18, 1990. There were no children of the marriage. Prior to the marriage, Wife had been a twenty-year employee of the Tennessee Valley Authority (" TVA"). She and Husband met during the course of her employment – she was in charge of purchasing nuclear fuel and he worked for

an energy supplier.[1]  The couple dated approximately a year before Wife suffered a debilitating stroke in 1986.  Wife, who had numerous residual side effects from the stroke, was forced to take a disability retirement from TVA.  Wife and Husband continued to date another four years until their marriage.  Husband had his own health problems, having undergone an ileostomy some years prior to the marriage.  Wife testified that the respective physical handicaps did not affect their love and affection for one another.

Husband's employment required him to travel numerous days per year, both before and after the parties' marriage.[2]  During the parties' four-year courtship, Husband lived in Maryland and commuted to Chattanooga.  The parties' marriage was also a commuter relationship.  From the date of the marriage until October 1999, Husband commuted on the weekends between the Atlanta area and Chattanooga.  He then solicited a job through a headhunter firm for a position with Exelon, a Chicago-based corporation.

Prior to taking the Exelon job, the parties discussed the ramifications of the new position and the attendant travel requirements.  Husband wanted to seize the Exelon opportunity because it sounded interesting and would result in a significant salary increase.  Husband told Wife that he would return to Chattanooga every two weeks.  She accompanied him to Illinois for four weeks to help find a house, which was jointly titled upon its purchase.  Wife also assisted in securing the furnishings for the home.

In 2004, Husband filed a complaint for divorce in the State of Illinois.  After that complaint was dismissed, Wife filed the instant complaint for divorce on May 13, 2005.  Trial was conducted in March 2010.

Wife, 64 years of age at the time of the trial, testified that the parties' marriage had been a happy one, which Husband affirmed in his testimony.  She introduced romantic letters from Husband and related that the letters were typical of ones she

---

[1]At the time of the marriage, Husband was employed at NAC International as Vice President of Consulting Services, making approximately $51,300 per year.

[2]Husband's job often required travel around the world, giving Wife the opportunity to join him on a number of trips.  The record reveals that if Wife did not accompany Husband, he typically called her each day while he traveled.

received from him while he was away on business. Wife indicated that the couple maintained an active sexual and intimate life throughout their marriage. She recalled discussing with Husband her belief that he was working too hard and was a "workaholic." She observed that Husband had a temper and had used profanity toward her. Husband acknowledged this behavior in his testimony. Wife testified that when she received notice that Husband had filed a complaint for divorce in Illinois, she was shocked.

As a result of Wife being completely disabled at the time of the parties' marriage, she was already receiving a disability pension from TVA and Social Security disability insurance benefits. When the couple married in 1990, Wife received $13,975 in TVA disability income, $11,712 in Social Security benefits, and $5,103.61 in interest income. Wife had a 401(k) account while working at TVA, but made no contributions to it during the course of the marriage. She owned a house on Tree Top Lane in Hamilton County when the marriage began, in which she continues to reside. At the time of trial, she had lived in the house for about 35 years. Due to maintenance issues, Wife valued the home at $120,000 at the time of the marriage as well as at the time of the trial.

Wife testified that she paid her property taxes, utilities, cable, and her personal expenses from her disability funds. She noted that she made deposits into the TVA Federal Credit Union ("TVAFCU") with those monies she did not spend for her personal needs. Wife did not produce any statements showing her assets as of the time of the marriage and could not remember the specific amount of assets she held on deposit during that time period. Her asset and liability statement listed the following: residence, TVA pension, TVA 401(k) and fixed annuity plan, TVA traditional IRA CD, TVAFCU IRA share account, and the increase in value of her various credit union and cash investment accounts of over $600,000. With regard to her assets, Wife testified that she had certificates of deposit when she was employed by TVA and it had always been her practice to rollover the certificates as they matured. She indicated that Husband had given her $8,000 as a gift to put in an IRA. This testimony was unrebutted. According to Wife's testimony, Husband encouraged her to spend freely. Her income and expense statement reflected a monthly income of $3,856.25 and expenses of $7,156, which produced a deficit of $3,299.75 per month. There was no cross examination of Wife by Husband's counsel.

The testimony at trial revealed that Husband furnished Wife with a credit card

for her other expenses and her charges upon the card in the three years preceding trial averaged $4,060.46 per month. At trial, Husband complained that Wife's expenditures were excessive, but he did not claim an inability to pay alimony. He did not believe the $2,000 per month listed on his income and expense statement for leisure and travel was excessive.

Susan McClure, Wife's 41-year-old daughter ("Daughter"), testified that she had been aware of her mother's relationship with Husband since 1986. She verified the parties had always engaged in a long distance relationship. She knew her mother and Husband traveled together, and that Wife had gone to Chicago to look for houses and to go furniture shopping. Daughter stated she had a cordial relationship with Husband, that he seemed to "care a lot" for Wife, and that the marriage had seemed to be a happy one. According to Daughter, when her mother was served with the Illinois divorce papers, Wife was "devastated, surprised, shocked . . . ." She observed that her mother remained "tearful" and was sad and withdrawn. Daughter noted that Wife, post-stroke, has never traveled out of town except with a group, a third party, or Daughter; she will only drive locally to places with which she is familiar.

Husband testified that he filed for divorce initially because Wife refused to travel to Illinois in 2003 to care for him during an illness. According to Husband, when he sought assistance from Wife, she told him that she had to stay in Chattanooga to care for her mother and suggested he might be a hypochondriac. He stated: "That more than anything else just put me over the edge."

Husband retired from his $900,000 per year job at age 63 because he felt he was "burned out." His retirement date from Exelon was October 30, 2009. As to his separate, pre-marital assets, he claimed only a Morgan Stanley 401(k) and conceded the increase in that account was marital property.

Husband noted that when the parties met prior to Wife's stroke, her employment at TVA was a very responsible position that required her to represent TVA's interest in the secondary market for nuclear fuel. The job required interaction with consultants, brokers and traders, and involved sophisticated analysis and quick response to changing market conditions; Wife was required to balance several variables in each transaction and make recommendations to TVA's upper management.

Husband acknowledged that prior to the parties' marriage, he had full knowledge of Wife's physical and mental impairments and of her inability to work. He admitted that he knew her future income would be limited to Social Security and her TVA retirement. Husband stated that he knew Wife's social interactions were going to be limited because of the stroke, "but she worked hard and improved." According to Husband, Wife accompanied him on trips "all over the world," and he responded affirmatively to the question that for "a very long period of time in this marriage [he] and [Wife] were very happily married."

Husband related that he owed $3,094 a month on the Illinois house worth $250,000. Tax returns prepared for tax year 2009 reflected that Husband owed about $85,000 between the IRS and the State of Illinois.

Husband presented testimony from a certified public accountant, Shannon Farr. Ms. Farr testified that she had no statements from either party as to the balances in their respective investment accounts as of the date of the marriage and was required to prepare estimates of values. She estimated Husband's pre-marital Morgan Stanley 401(k) had increased in value by $167,870. She estimated the accounts held by Wife had increased from $59,666 as of the date of the marriage to the current value of approximately $760,000. Ms. Farr testified that the value of Wife's TVA 401(k) was $24,717 at the time of the marriage and $96,914 at the time of the trial, with the difference being $72,197.

Ms. Farr acknowledged Wife's right to receive the TVA pension accrued prior to the parties' marriage and no contributions had been made to the TVA retirement, pension, and 401(k) plans during the marriage. Ms. Farr estimated that as of the date of the marriage, the TVA pension was worth $164,181 with the present value being $299,507. Thus, the increase in value since the date of the marriage was $142,806. She acknowledged that the pension benefit ceases upon Wife's death.

Ms. Farr testified Husband had accumulated total monthly pension benefits through his employment at Exelon of $5,130 per month, which would be reduced to $4,173 at age 65. In addition, Husband had received at Exelon deferred compensation of $847,106, a stock deferral plan of $390,000, a 401(k) plan of $232,000, and a flexible compensation plan of $205,000. All of these assets were accumulated during the parties' marriage. Ms. Farr admitted that Husband had significant income as reflected on his tax returns for stock options which had

accumulated prior to the parties' separation, most notably options exercised in 2007, which generated $2,300,000 in income. These options vested 25 percent in each of the years after they were awarded and would have been awarded in 2003. Ms. Farr assigned no value to 20,200 shares of vested and non vested stock options owned by Husband, since the grant price was currently below the sale price. At the time of trial, Ms. Farr calculated the value of the total marital estate at $7,323,910.

Under cross examination, Ms. Farr acknowledged Husband had paid her $54,191 and he owed an additional $13,188 plus her time to appear and give testimony at trial.

The trial court entered its memorandum opinion and order on March 25, 2010. The court held, *inter alia*, as follows:

> It is the Husband's position that the Wife did nothing to contribute to the appreciation of the majority of this property because of their separate living arrangements in part, and that she is not entitled to an equal division of the property but an equitable one. While the Court agrees that equitable is not always equal, Husband's suggestion that the Wife should receive twenty percent of the marital estate consisting of over seven million dollars is neither equal nor equitable.
>
> Husband states that before the parties married, he helped to nurse her back to health from her stroke, but when he became "desperately" ill in 2003, she failed to come to his Chicago home to stay with him. . . .
>
> . . . Wife says she stayed in Chattanooga because of the illnesses of her elderly mother. . . . Husband opines that the parties separated in late 2002 or 2003, though his illness was not until June of 2003 and the Chicago divorce was filed in February of 2004.
>
> * * *
>
> . . . There is no dispute that the bulk of the marital estate was accumulated when [Husband] took the Exelon position in Chicago. It is also undisputed that Husband actually was in Chattanooga approximately 90 days a year.

-6-

Wife came into the marriage with separate property. These items included: her premarital residence at 536 Tree Top Lane, which is paid for, which the Court values at $120,000, $48,000 of which is marital property. Her other separate property: TVA defined benefit plan earned prior to the marriage of $2,003 per month; her TVA 401K and TVA RD accounts which she values at $96,913; her TVFCU accounts which she values at $45,121; her TVFCU IRA share account which she values at $222.92; and her credit union cash investment accounts prior to marriage various accounts totaling $623,183.24, for a total of $883,436.17. Husband's separate property at the time of the marriage included a Smith Barney IRA rollover account valued at $94,323. The Court finds that neither party materially contributed to each other's separate property except for the Tennessee home Wife occupies.

As stated above, it is Husband's contention that Wife did not contribute to the appreciation of his assets which he earned in Chicago and that she has sufficient separate assets to care for herself. His proposed division reflects the monetary contribution of each party to the acquisition or appreciation of the assets based on the income of each party during the marriage. . . .

. . . Costs are taxed to Defendant. Each party shall pay their own attorneys fees.

The trial court valued the marital estate at $7,289,019; it awarded Husband $4,320,030 and Wife $2,968,989, which resulted in a 60-40 distribution in Husband's favor. The court did not address the $68,965.75 in marital funds paid by Husband to Ms. Farr and did not address the $61,979.57 in marital funds paid by Husband to his attorney. The court did not apportion these expenditures to either party as part of the distribution of the marital estate and declined to award Wife any award for attorneys fees. The trial court gave Wife no interest in the over 20,000 shares of vested and unvested stock options.

Motions by both parties to alter or amend the judgment were denied by the trial court. Husband filed a timely notice of appeal.

Wife filed a post trial motion in the trial court seeking possession of the assets

awarded her, or alternatively to require Husband to post a cash bond as provided by Tenn. R. App. P. 4, Husband moved for a stay pending appeal. Upon Husband's request for us to review this order, we found the posting of said bond to be unnecessary and continued the mandatory statutory injunction set forth in Tenn. Code Ann. § 36-4-106(d) until the conclusion of the proceeding was sufficient to secure the award.

Wife filed a post trial motion in the trial court seeking possession of the assets awarded her, Husband moved for a stay pending appeal. The trial court granted Husband's motion conditioned upon him posting a cash bond of $2,067,175. Upon Husband's request for us to review the trial court's order, we found the posting of said bond to be unnecessary and continued the mandatory statutory injunction set forth in Tenn. Code Ann. § 36-4-106(d) until the conclusion of the appeal.

## II. ISSUES

The issues before us relate to the classification, valuation, and division of the marital assets. Wife presents the following additional issues:

1. Did the trial court err by not including Husband's expenditures for his attorney and expert witness as part of the marital estate, and for failing to add Husband's vested and unvested stock options as part of the marital estate and dividing those funds proportionately?

2. Is Wife entitled to her reasonable attorney fees upon appeal?

## III. STANDARD OF REVIEW

The factual findings of the trial court are accorded a presumption of correctness, and we will not overturn those factual findings unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Southern Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

The trial court's classification and division of property is reviewed de novo with a presumption that the trial court's factual findings are correct. *See Watters v. Watters*, 959 S.W.2d 585, 588 (Tenn. Ct. App. 1997). An appellate court may alter the trial court's division of property only if the trial court misapplies the law or if the evidence preponderates against the trial court's factual findings. *See Wade v. Wade*, 897 S.W.2d 702, 715 (Tenn. Ct. App. 1994). We must give great weight to the trial court's decisions in dividing marital assets, and "'we are disinclined to disturb the trial court's decision unless the distribution lacks proper evidentiary support or results in some error of law or misapplication of statutory requirements and procedures.'" *Keyt v. Keyt*, 244 S.W.3d 321, 327 (Tenn. 2007) (quoting *Herrera v. Herrera*, 944 S.W.2d 379, 389 (Tenn. Ct. App. 1996)).

"Because trial courts are in a far better position than this Court to observe the demeanor of the witnesses, the weight, faith, and credit to be given witnesses' testimony lies in the first instance with the trial court." *Keyt*, 244 S.W.3d at 327 (citing *Roberts v. Roberts*, 827 S.W.2d 788, 795 (Tenn. Ct. App. 1991)). Thus, "where issues of credibility and weight of testimony are involved, this Court will accord considerable deference to the trial court's factual findings." *Id.* (citing *In re M.L.P.*, 228 S.W.3d 139, 143 (Tenn. Ct. App. 2007)).

## IV. DISCUSSION

In actions for divorce or for legal separation, Tenn. Code Ann. § 36–4–121(a)(1) authorizes the trial court to equitably divide, distribute, or assign the marital property "without regard to marital fault in proportions as the court deems just." *Jolly v. Jolly,* 130 S.W.3d 783, 785 (Tenn. 2004). The court is directed to consider all relevant factors in its distribution of marital property, including those listed in Tenn. Code Ann. § 36–4–121(c). *Id.,* 130 S.W.3d at 786; *Flannary v. Flannary*, 121 S.W.3d 647, 650 (Tenn. 2003), so long as the division is made without regard to marital fault.

"The trial court is empowered to do what is reasonable under the circumstances and has broad discretion in the equitable division of the marital estate." *Keyt v. Keyt,* 244 S.W.3d 321, 328 (Tenn. 2007) (citing *Flannary,* 121 S.W.3d at 650). Because the division of marital property is "not a mechanical process," and because decisions regarding division of marital property are fact-specific and many circumstances

surrounding the property and the parties play a role, a trial court has a great deal of discretion concerning the manner in which it divides marital property. *Keyt,* 244 S.W.3d at 328; *Jolly,* 130 S.W.3d at 785; *Flannery,* 121 S.W.3d at 650; *Smith v. Smith*, 984 S.W.2d 606, 609 (Tenn. Ct. App.1997).

Before dividing marital property, the court must first classify the parties' property as separate or marital. *Snodgrass v. Snodgrass*, 295 S.W.3d 240, 246 (Tenn. 2009); *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). Separate property – "[a]ll real and personal property owned by a spouse before marriage . . . ." – is not part of the marital estate and is therefore not subject to division. Tenn. Code Ann. § 36-4-121(b)(2) (2010); *see Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995). The trial court has wide discretion in classifying property. *Dunlap v. Dunlap*, 996 S.W.2d 803, 814 (Tenn. Ct. App. 1998). On appeal, the trial court's decision on this issue is entitled to great weight, and absent an error of law, the court's classification of property will be reversed or modified only if the evidence preponderates against the court's decision. *Id.*

Tenn. Code Ann. § 36-4-121 governs the classification of property as marital or separate. "Marital property" means:

> all real and personal property, both tangible and intangible, acquired by either or both spouses during the course of the marriage up to the date of the final divorce hearing and owned by either or both spouses as of the date of filing of a complaint for divorce . . . .

Tenn.Code Ann. § 36–4–121(b)(1)(A)(2010). *See also Snodgrass,* 295 S.W.3d at 243.

Tenn. Code Ann. § 36-4-121(b)(1)(B) provides that

> (B) "Marital property" includes income from, and any increase in value during the marriage of, property determined to be separate property in accordance with subdivision (b)(2) if each party substantially contributed to its preservation and appreciation, and the value of vested and unvested pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage.

Tenn. Code Ann. § 36-4-121(b)(1)(B) (2010).  Tenn. Code Ann. § 36-4-121(b)(1)(B) contains two independent definitions of marital property.  The first clause refers to income from and appreciation on separate property that accrues during the marriage where "each party substantially contributed to [the separate property's] preservation and appreciation."  Tenn. Code Ann. § 36-4-121(b)(1)(B).  The second clause refers to "the value of vested and unvested  pension, vested and unvested stock option rights, retirement or other fringe benefit rights relating to employment that accrued during the period of the marriage."  If the property at issue is deemed to fit within this second clause, then it is marital property without regard to "substantial contributions" by either spouse.  *See Batson*, 769 S.W.2d at 857 (recognizing that "[t]he pension provision is not modified by the 'substantial contribution' requirement preceding it" and that "pension benefits earned by a spouse during the marriage are marital property even though the other spouse did not contribute directly to their preservation or appreciation").

As noted in *Snodgrass*,

Once the property is determined to be a pension, stock option, retirement or other fringe benefit right relating to employment, the issue becomes one of determining the value of that benefit that accrued during the marriage . . . .

* * *

. . .  If a contested piece of property fits within the second clause of (b)(1)(B), then the entire net increase in value of that property that accrues during the marriage, through whatever means or methods, is deemed marital, even if the property contains an element of separate property.

If, however, the property at issue does not fit within this second clause and is otherwise deemed to be separate, any income from or appreciation of the property will remain separate unless a court finds sufficient evidence to support a theory of substantial contribution, commingling, transmutation, gift to the marital estate, or some other theory by which otherwise separate property may be deemed marital.

*Snodgrass*, 295 S.W.3d at 247-49 (citations and footnote omitted).

## A.

Husband argues that the trial court erred in failing to classify certain property as marital property subject to equitable division.

Wife was already receiving social security benefits and her TVA disability pension when she married Husband. Her position at trial was that the disability payments continued to be her separate property because she deposited the payments into accounts in her separate name. The trial court found that the TVA pension benefit was $2,003.99 per month. In its "Division of Assets," the court listed the "TVA Retirement System Funded Pension Benefit" in two places: Wife's Separate Property and Marital Assets. It appears to us that the trial court awarded it as Wife's separate property.

Our legislature provided in Tenn. Code Ann. § 36-4-121 that "recovery in . . . social security disability actions, *and other similar actions* for . . . wages lost during the marriage . . ." is marital property." *See* Tenn. Code Ann. § 36-4-121(b)(1)(C) (emphasis added). In this case, however, the disability pension benefits Wife began receiving prior to the marriage were not recovered in any "action" for "wages lost during the marriage." Rather, the benefits were awarded for twenty years of service to TVA, the employer from which Wife retired due to disability several years prior to the marriage. We find that the trial court properly valued the income stream as wife's separate property.

## B.

Husband further asserts that the trial court did not consider the increases that occurred in Wife's accounts during the marriage to be marital assets. Wife had argued at trial that her accounts were her separate property. The trial court in its "Division of Assets," as set forth below, rejected the argument by Wife and correctly found the increases in the Wife's accounts to be marital property:

| | |
|---|---|
| TVAFCU, DCCU & CFCU Bank Accounts | $563,517 |
| Wife's Credit Union and Cash Investment account *after marriage* TVAFCU Checking Account 253160-10 | $42,206 |
| Wife's Credit Union and Cash Investment account *after marriage* TVAFCU Share Account 253160-00 | $35,413 |
| TVA 401(k) and TVA RS Fixed and Variable Plan | $72,196 |
| TVAFCU 6 Month Trad IRA CD 253160-62 | $26,054 |

Accordingly, the argument by Husband that the trial court classified the increases in Wife's accounts as her separate property is without merit.

## C.

Wife claims there is a mathematical error on the trial court's "Division of Assets" chart in the column total regarding Wife's separate property, as the correct total amount of separate property belonging to Wife is $175,670.92. It appears the entire total value of the Tree Top Lane house of $120,000 is figured into the calculation as Wife's separate property, despite the fact that the trial court found there to be a $48,000 increase in the value of the house during the marriage, which increase was designated marital. Thus, the math in the trial court's calculation of the Wife's separate property contains a small error.

We agree with Wife that her separate assets amounted to $175,670.92 plus her pension. Husband's separate assets found by the trial court amounted to $94,323.

## D.

Husband argues that the trial court erred in dividing the parties' marital estate. He asserts that Wife was entitled to only a small percentage of the marital estate because he contributed 90 percent of all marital assets. Husband argues that Wife became disabled before the marriage and has sufficient income from sources independent of Husband to support herself.

The trial court found the total value of the marital assets equaled $7,289,019. Wife was awarded $2,968,989 of that amount. Husband was awarded $4,320,030. The trial court's findings resulted in a 60-40 distribution in Husband's favor.

Pursuant to Tenn. Code Ann. § 36–4–121(c), the courts are directed to consider the following factors in making a division of the marital estate:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contributions by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled his or her role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36–4–121(c) (2010).

In the instant case, the division of the marital estate is well within the wide range of discretion in light of the multimillion dollar value of the marital property at issue. It is our conclusion that the trial court properly considered the relevant factors enumerated in Tenn. Code Ann. § 36-4-121(c). The evidence certainly does not preponderate against the trial court's finding that the division of property is equitable to both parties.

## E.

Wife argues that the evidence preponderates against the trial court's refusal to include Husband's expenditure of $130,945.32 for his attorney and expert fees as part of the marital estate and for not dividing these funds on the same basis as was the remainder of the marital estate. We agree. Accordingly, Wife is awarded forty percent of the $130,945.32 as her equitable share of the marital estate.

## F.

Wife further contends that the evidence preponderates against the trial court's refusal to include the over 20,000 shares of vested and unvested stock options as part of the marital estate and for not dividing these funds on the same basis as was the remainder of the marital estate.

At the time of trial, Husband's stock options were at an option price below the market price.  However, there is adequate time prior to the expiration of the option period for them to recover their value and become a valuable marital asset.  In *Cohen v. Cohen*, 937 S.W.2d 823, 827 (Tenn. 1996), the Tennessee Supreme Court held that vested and unvested retirement benefits accruing during the marriage constitute marital property pursuant to Tenn. Code Ann. § 36-4-121(b)(1)(B).  To determine that because the stock options have no value now and to assume therefore they will have no future value is speculative and denies Wife the right to share in any future gains from an employment benefit which accrued during the marriage.  Wife is entitled to the same percentage, i.e., forty percent, of the gains realized from any future exercise of those options.  Husband has the obligation to notify the trial court if he exercises or does not exercise the stock options and must provide proof of value.  The trial court will retain jurisdiction to oversee payment, if any.

## G.

Wife requested of the trial court that her attorney fees be paid by Husband.  The trial court, however, determined that the parties should be responsible for their own attorney fees.  We find no abuse of discretion in the trial court's decision with respect to attorney fees.

Wife also asked this court to award her appellate attorney fees.  An award of such fees is a matter within our sound discretion. *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995).  Exercising that discretion, we respectfully decline to award Wife attorney fees on appeal.  Additionally, we decline to find Husband's appeal to be frivolous.

## V.  CONCLUSION

The judgment of the trial court is affirmed as modified.  This case is remanded to the trial court for further proceedings consistent with this opinion.  The costs on appeal are taxed to the appellant, James P. Malone.

_____
JOHN W. McCLARTY, JUDGE

-16-